UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KATHLYN M. STEIN,            )
            Plaintiff,        )
                             )
                             )
    v.                       )        Civil No. 3:23-cv-30100-KAR
                             )
                             )
DOUGLAS A. COLLINS, Secretary )
U.S. DEPARTMENT OF VETERAN   )
AFFAIRS,                     )
            Defendant.        )

MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
ON HER COUNTS I, III, IV, V AND VI CLAIMS; DEFENDANT'S CROSS-MOTION FOR
SUMMARY JUDGMENT; & PLAINTIFF'S MOTION FOR A COURT ORDER: 1) TO
EXCEED (DOCS. 54, 55) PAGE LIMITS; and 2) DECLARING THAT HER STATEMENT OF
MATERIAL FACTS (DOC. 55) SHALL BE DEEMED ADMITTED IN FULL DUE TO
DEFENDANT'S (DOCS. 62, 63) NON-COMPLIANCE WITH LOCAL RULE 56.1
(Dkt. Nos. 53, 62, & 64)

ROBERTSON, U.S.M.J.

    The plaintiff, Kathlyn Stein ("Plaintiff"), a former employee of the United States

Department of Veterans Affairs ("VA"), is suing the defendant, Douglas A. Collins, Secretary of

the VA ("Defendant"), for discriminating against her on the basis of her sex in the payment of

wages in violation of Title VII, 42 U.S.C. § 2000e-2(a) (Count I);[1] creating a hostile work

environment, also in violation of Title VII, 42 U.S.C. § 2000e-2(a) (Count III);[2] failing to

reasonably accommodate her disability in violation of the Rehabilitation Act, 29 U.S.C. § 794

---

[1] Plaintiff sought to amend her complaint to bring a claim under the Equal Pay Act, 29 U.S.C. §
206 *et seq.*, on the same basis, but this court denied leave on futility grounds where another
session previously determined that this court lacks subject matter jurisdiction over the claim,
thereby precluding re-litigation of the issue (Dkt. No. 45).
[2] Plaintiff's amended complaint does not include a Count II.

(Count IV); and engaging in retaliatory constructive discharge in violation of Title VII, 42, U.S.C. § 2000e-3 (Count V) and the Rehabilitation Act, 29 U.S.C. §§ 791, 794 (Count VI) (Dkt. No. 48). The parties have cross-moved for summary judgment (Dkt. Nos. 53, 62). In addition, Defendant asks that Plaintiff's statement of facts be stricken for failure to comply with Fed. R. Civ. P. 56 and D. Mass. L.R. 56.1 (Dkt. No. 63), while Plaintiff asks this court to deem her statement of material facts admitted based on Defendant's failure to comply with D. Mass. L.R. 56.1 (Dkt. No. 64). Plaintiff also moves belatedly for leave of court allowing her to exceed the 20-page limit in connection with her 65-page memorandum in support of her motion for summary judgment (Dkt. No. 64). The parties have consented to this court's jurisdiction (Dkt. No. 19). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

Neither party requested oral argument with respect to any of their motions or oppositions as required by L.R., D. Mass. 7.1(d). Moreover, the self-represented Plaintiff requested that this court decide the motions without a hearing and Defendant did not object to this request (Dkt. No. 64 at 6). Having concluded that oral argument is unnecessary, the court decides these motions without a hearing as requested by Plaintiff. For the following reasons, taking into consideration Plaintiff's self-represented status, the court GRANTS IN PART Plaintiff's motion (Dkt. No. 64) insofar as she seeks leave to exceed the page limit; DENIES IN PART Plaintiff's motion (Dkt. No. 64) insofar as she seeks to have her statement of facts deemed admitted; DENIES Defendant's request to have Plaintiff's statement of facts stricken, which is not in the form of a motion (Dkt. No. 63); DENIES Plaintiff's motion for summary judgment (Dkt. No. 53); and GRANTS Defendant's cross-motion for summary judgment (Dkt. No. 62).

## I.    SCOPE OF THE RECORD

Before turning to the merits of the cross-motions for summary judgment, it is necessary to determine the scope of the record.  Defendant asks this court to strike Plaintiff's statement of facts because it fails to comply with Fed. R. Civ. P. 56 and Local Rule 56.1.  The latter requires the movant to file a "concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried …." L.R., D. Mass. 56.1.  Defendant contends that Plaintiff's statement is noncompliant because it largely repeats the allegations in her amended complaint (which Defendant disputes), states conclusions of law, is replete with inadmissible evidence, and sets forth matters not relevant to the issues before the court. Defendant acknowledges that "Plaintiff cites to record evidence as required by the Rules," but he maintains that "her Statement adds her own conclusory allegations to and interpretation of the facts supported by the record citations, subjecting them to denial" (Dkt. No. 63).

The court denies Defendant's request.  While Fed. R. Civ. P. 56(c)(2) allows a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," such objections are meant to "function much as an objection at trial, adjusted for the pretrial setting."  *See* Fed. R. Civ. P. 56 Advisory Committee Notes, 2010 Amendment.  Defendant's wholesale objection to Plaintiff's statement of facts does not resemble to a trial objection to a particular question put to a witness or the witness's testimony in response.  Defendant's failure to identify the offending statements of fact with particularity as to which are disguised legal conclusions, consist of inadmissible evidence, or are irrelevant is fatal to his request.  That said, the court has carefully reviewed Plaintiff's statement, and its decisions on the cross-motions are not based on any improperly supported assertions of fact or asserted facts that have not been shown as presentable in a form that would be admissible in evidence.

For her part, Plaintiff asks that her statement of facts be deemed admitted based on Defendant's failure to controvert them as required by L.R., D. Mass. 56.1. The local rule provides that a "party opposing the motion [for summary judgment] shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation," with failure to do so resulting in the moving party's statement of facts being deemed admitted for purposes of the motion. *See* D. Mass., L.R. 56.1. In support of her argument that Defendant's statement is deficient, Plaintiff cites to the standing order of another session of this court, which requires the opposing party to "list the moving party's statement of facts in the same numerical order as presented in the moving papers and … state its response immediately beneath each numbered fact." *See* A. Kelly, D.J., Standing Order Regarding Motion Practice, https://www.mad.uscourts.gov/boston/pdf/djakelley/Standing%20Order%20re%20General%20Motion%20Practice.pdf (accessed 9/16/25). Plaintiff's request to have her statement of facts deemed admitted is without merit. Defendant filed a statement of facts largely disputing the facts set forth in Plaintiff's statement, and the standing order of another session of this court has no applicability to matters pending in this session. Therefore, Plaintiff's request to have her statement of facts deemed admitted is denied.

## II.      FACTS

Plaintiff graduated from the Yale Medical School Physician Associate Program in 1980 (PSF ¶ 4). In September 2010, she was hired by the VA as a full-time primary care physician assistant ("PA") in the Specialized Inpatient Psychiatric Unit ("SIPU") at the Edward P. Boland Department of Veterans Affairs Medical Center, located in Leeds, Massachusetts (PSF ¶ 4; DSF

¶ 1; Dkt. No. 63-64 at ¶ 6a).[3]  The facility is within the VA Central Western Massachusetts Healthcare System (CWMHS) and falls within the Hartford, Connecticut pay scale (DSF ¶ 22; Dkt. No. 63-64 at ¶ 6a).  Plaintiff's assignment throughout the course of this controversy was as a hospitalist consultant providing inpatient step-down psychiatric, post-traumatic stress disorder ("PTSD"), and acute detox medical care for combat veterans (PSF ¶ 64).

At the time of Plaintiff's hire, the VA presented PAs to a panel of their peers for hiring, promotion, and other professional issues, including grade and pay determinations (DSF ¶ 20). The panel made recommendations based on the standards set forth in VA Handbook 5005, considering the individual's experience, education, training, current licensure, and any certifications he or she held (DSF ¶ 21).[4]  VA pay scales for PAs were governed by 38 U.S.C. § 7404, while the pay scales for NPs were governed by the Nurse Pay Act of 1990, 38 U.S.C. § 7451, the latter of which utilized a locality pay system for NPs that was not in place for PAs (DSF ¶¶ 26, 31).  The panel set Plaintiff's starting grade as a PA at Grade 12 (Senior Grade) Step 10, earning $98,586 annually (DSF ¶¶ 21-22).  The next grade, Grade 13 (Chief Grade), was restricted to leadership positions at the time (DSF ¶ 22).

In 2014, the applicable qualification standard for PAs per VA Handbook 5005 was revised to provide that appointment to Grade 13 would be based on an individual's demonstrated high level of clinical expertise, leadership ability, and ability to function with a high degree of

---

[3] Plaintiff's title was changed in 2020 to physician assistant (hospitalist) following a national update of the physician assistant occupational title (DSF ¶ 2).

[4] Plaintiff purports to dispute DSF ¶¶ 20-21 by referring to PSF ¶¶ 23, 26, 28, 29, 31, 35, 40-46, and 61-65, which she claims show that VA CWMHS Directors Collins and Gill and Chief of Staff Seth Kupferschmid made employment decisions about Plaintiff (Dkt. No. 70 at ¶¶ 20-21). None of the cited paragraphs creates a genuine issue to be tried as to whether the VA presented PAs to a panel of peers for recommendations regarding employment decisions or the bases the panel used in making those recommendations.  Therefore, the court considers Defendant's Facts ¶¶ 20-21 undisputed for purposes of the motion.  *See* Fed. R. Civ. P. 56(e)(2).

autonomy (DSF ¶ 24). While the minimum education requirement was a master's degree from an ARC-PA accredited training program or in a health-related field of study, experience as a PA where the individual had an equivalent knowledge of the profession and had successfully undertaken a combination of difficult or complex assignments in several clinical, administrative, research, and educational arenas requiring a high degree of competence could serve as a substitute (DSF ¶ 24). The panel determined that it was appropriate to utilize Plaintiff's clinical experience as a PA as a substitute for a master's degree, and, effective July 10, 2016, Plaintiff's then first-line supervisor, Dr. Sarah Kemble, promoted her to Grade 13 (Chief Grade) Step 6 earning $108,729 annually (PSF ¶¶ 10-11; DSF ¶ 23).

Shortly after Plaintiff's promotion to Grade 13, in the fall of 2016, Dr. Seth Kupferschmid replaced Dr. Kemble as Plaintiff's first-line supervisor (PSF ¶ 12; DF ¶ 3).[5] Dr. Kupferschmid remained Plaintiff's first-line supervisor following his promotion to Chief of Staff in December 2016 and throughout the time period relevant to Plaintiff's claims (PSF ¶ 13; DF ¶ 4). Before being employed by the VA, Dr. Kupferschmid had been accused of sexual harassment as part of a larger complaint against his then-employer, which was settled without any admission of fault by Dr. Kupferschmid (PSF ¶ 14).[6] During Dr. Kupferschmid's first inpatient medical provider team meeting attended by Plaintiff, he commented that he "hate[d]

---

[5] Plaintiff submits a newspaper article which cites to an affidavit Dr. Kemble submitted to U.S. officials five days before she died of uterine cancer, detailing what Dr. Kemble believed were problems of substandard care at the VA facility and the retaliatory nature of her demotion from chief of medicine to chief of primary care for reporting the problems (PF ¶¶ 19-22). A newspaper article is inadmissible hearsay and cannot be weighed in deciding whether Plaintiff has raised a genuine issue of material fact, *Horta v. Sullivan*, 4 F.3d 2, 8-9 (1st Cir. 1993), and Dr. Kemble's affidavit is not part of the record. Therefore, the facts Plaintiff attempts to establish based on the article are not properly part of the summary judgment record.
[6] That Dr. Kupferschmid was accused of sexual harassment in a previous position does not prove that he engaged in sexual harassment.

dealing with … FMLA [i.e., Family Medical Leave Act] people," which Plaintiff inferred included her as a custodial grandmother, as well as two other female team members with health problems (PSF ¶ 16).

Effective in January of every year following Plaintiff's promotion to Grade 13, she received general adjustment salary increases (DSF ¶ 25).  In April 2017, Dr. Kupferschmid met with Plaintiff about an "outstanding" proficiency evaluation from Dr. Kemble that he claimed to have lost (an assertion about which Plaintiff expresses incredulity) and then downgraded, and which Plaintiff refused to sign because she believed it was an act of discrimination based on her sex and FMLA status (PSF ¶¶ 24-25).  Dr. Kupferschmid remarked to Plaintiff during this meeting, "[i]t must be so difficult to be a [custodial] grandmother parenting young children" (PSF ¶¶ 24-25).  Thereafter, from 2017 through 2021, Dr. Kupferschmid failed to perform evidence-based yearly evaluations of Plaintiff, thereby precluding her from the possibility of receiving yearly "outstanding" bonuses as she had from 2015 to 2017 (PF ¶ 85).  In May 2017, Dr. Kupferschmid informed Plaintiff and her workgroup that he was going to change staffing due to changes in programs, census, and patient needs of the organization.  Plaintiff disagreed with these changes with respect to the inpatient mental health units where she worked (DF ¶¶ 49-50).  In July 2018, Plaintiff received a "within grade" salary increase and a $750 cash award in recognition of her performance (DSF ¶ 25).  Plaintiff received another "within grade" salary increase the following July (DSF ¶ 25).

On August 12, 2017, Public Law 115-46, VA Choice and Quality Employment Act of 2017, went into effect, amending 38 U.S.C. § 7451 to include PAs in the locality pay system that heretofore had applied to NPs but not PAs (PSF ¶ 27; DSF ¶ 27).  To implement the provisions of the law as relating to pay administration, VA Handbook 5007 was revised effective October

16, 2020, to establish the Title 38 Locality Pay System for PAs and eliminate references to special salary rates authorized under 38 U.S.C. § 7455 for PAs (DSF ¶ 46).[7]  VA CWMHS conducted a local labor market wage survey under the provisions of the locality pay system for NPs in 2017 and implemented a pay schedule with an approximate 5% increase over the previous pay schedule effective October 1, 2017, as a result (DSF ¶ 35).  In or around November 2018, VA CWMHS conducted a PA salary range review based on a complaint by Plaintiff, but it determined that it did not have a recruitment or retention issue for PAs and that PA rates of pay were comparable to those in the community for the type of assignments performed (PSF ¶ 41; DSF ¶ 36).[8]

Less than a week after Plaintiff's complaint precipitating the survey, Dr. Kupferschmid informed Plaintiff that he had "oversight of her equitable pay" and suggested perhaps she should seek employment outside the VA (PSF ¶ 41).  On December 3, 2018, Plaintiff filed an informal complaint of wage discrimination on the basis of her sex in violation of the EPA and Title VII

---

[7] The locality pay system is structured as follows.  It includes five grade levels with a pay range for each grade; each grade is further divided into steps with the maximum range for each grade representing 133% of the minimum for that grade, although that range can be expanded to 175% if recruitment and retention problems arise within the relevant labor-market area (DSF ¶¶ 31-32). Directors of VA facilities are required to use Bureau of Labor Statistic wage survey statistics on beginning rates of pay for corresponding healthcare professionals in the local labor market unless that information is not current or available, in which case they must conduct a survey in the facility's local market (DSF ¶ 33).  Based on the results of the survey, the Director then determines whether a rate adjustment for covered positions is necessary to accomplish the stated purpose of the Nurse Pay Act, which is to ensure that rates of pay for healthcare personnel in the VA are "sufficient for that facility to be competitive, on the basis of pay and other employee benefits, with non-Department health-care facilities in the same labor-market area in the recruitment and retention of qualified personnel" (DSF ¶¶ 31, 34).

[8] Plaintiff purports to dispute DSF ¶ 36 based on the allegations in her complaint that CWMHS failed to conduct surveys of competitive "labor-market area" pay equally for PAs and NPs (Dkt. No. 70 at ¶ 36; PSF ¶ 29).  Plaintiff's unsubstantiated claim that CWHMS failed to conduct the required survey does not create a dispute of fact as to the representation of James G. Perrault, VA CWMHS's Senior Strategic Business Partner and former Human Resources Manager, that the survey was conducted (Dkt. No. 63-1 at ¶¶ 14-15).

with the VA's Office of Resolution Management, Diversity, and Inclusion ("ORM") (PF ¶ 32). On December 6, 2018, Plaintiff's ORM informal complaint counselor Kim Marcelle sent her a letter with an included Notice of Rights and Responsibilities indicating that if the recipient had an EPA complaint, she could file a formal EEO complaint or lawsuit in federal district court (PF ¶ 38).

Shortly after filing her ORM informal complaint, Plaintiff advised Director Collins and Dr. Kupferschmid about it and raised a concern about possible retribution (PSF ¶¶ 33-34). Director Collins replied, asking Plaintiff to notify him if she ever felt she was experiencing an act of retribution (PF ¶ 35). Plaintiff responded to Director Collins on December 18, 2018, alerting him to her continued fear of retribution by Dr. Kupferschmid and asking him for "emergency protections" based on the following factors: the lost then downgraded proficiency evaluation; Dr. Kupferschmid's comment to her about finding other employment; and warnings from other female providers about Dr. Kupferschmid (PSF ¶¶ 40-45).[9] Director Collins never responded or, to Plaintiff's knowledge, investigated as a result of her report raising her fear of retribution (PSF ¶ 46). On December 27, 2018, Plaintiff withdrew her ORM complaint and filed an EPA case in federal court (PSF ¶ 48).

In or around late February 2019, PA Lynn Lapour took an extended leave of absence, leaving Plaintiff and Dr. Shelly Berkowitz to cover the extra workload (PSF ¶ 105). Starting at the end of July 2019 through December 2019, Plaintiff and Dr. Berkowitz sent email

---

[9] Plaintiff represents that she was told by other female providers about Dr. Kupferschmid's misogynistic and retaliatory attitudes and actions in the past. The substance of such out-of-court reports from other providers is inadmissible hearsay and such statements cannot be considered for their truth. For purposes of deciding the cross-motions, the court accepts that Plaintiff was warned by other female providers about Dr. Kupferschmid and that she told Director Collins as much, but it cannot accept such reports as establishing the truth of such allegations against Dr. Kupferschmid.

correspondence to Dr. Kupferschmid urging him to fill PA Lapour's position to avoid patient endangerment and stating their views that the current staffing was unsustainable (PSF ¶¶ 108-109, 111-113).  In addition, on November 5, 2019, Plaintiff testified in a VA Office of the Inspector General ("OIG") proceeding regarding what she viewed as Dr. Kupferschmid's staffing incompetence and veteran patient endangerment (PSF ¶ 110).  Sometime in December 2019, Dr. Kupferschmid advised Plaintiff that her productivity was "among the lowest in the medical center" in response to her complaints about workload and offered her the services of a coach to help with efficiency and time management (DSF ¶¶ 51, 53; Dkt. No. 63-3 at 6; Dkt. No. 63-15 at 2).  Plaintiff advised Dr. Kupferschmid that she viewed his behavior as "consistent with retaliation," while Dr. Berkowitz told Dr. Kupferschmid that "the language and tone of [his staffing] analysis [felt] bullying, retaliatory, patronizing and paternalistic, and furthermore show[ed] complete lack of understanding of the actual unit conditions in which [Plaintiff] and [Dr. Berkowitz] work[ed]" (PSF ¶¶ 115, 119-120).  During a meeting on December 19, 2019, attended by Plaintiff, Dr. Kupferschmid, Dr. Berkowitz, and a union representative, Dr. Kupferschmid leaned forward against a table and raised and shook his left hand at Dr. Berkowitz and berated her work, while he challenged the credentials of the union representative, a young black woman, to represent Plaintiff and Dr. Berkowitz during the meeting (PSF ¶121).  Thereafter, on December 27, 2019, Plaintiff filed a whistleblower complaint against Dr. Kupferschmid with the Office of Special Counsel ("OSC") regarding what she viewed as his staffing incompetence and patient-endangering conduct (PSF ¶ 124).  Plaintiff emailed Dr. Kupferschmid on January 24, 2020, telling him that she felt his "recent negative interactions" were retaliatory in response to her OIG interview and asking him to "cease and desist from any

further demeaning or derogatory communications about [her] with anyone at all (PSF ¶¶ 127,

131).

At the outset of the COVID-19 pandemic in March 2020, Plaintiff reached out to her

family physician for documentation supporting her absence from work (PSF ¶ 132). Plaintiff's

doctor wrote two letters, which Plaintiff provided to the VA, asking that Plaintiff's absence be

excused from March 16 to April 6, 2020, and March 16 to June 6, 2020, respectively, to care for

her grandson, who was unable to go to school due to school closures, was expressing distress,

and had developed a fever as of March 18, 2020 (PSF ¶¶ 132-33). On March 31, 2020, Plaintiff

reached out to Dr. Kupferschmid by email inquiring about teleworking three days per week and

submitted a "Telework Request/Agreement," which she electronically signed on April 3, 2020,

to work remotely on an *ad hoc* basis, meaning an "occasional, episodic, or short-term basis," for

12 months, indicating that Plaintiff was "not using telework as an accommodation for a qualified

temporary disability or for medical reasons" and that "this agreement is just to cover any

emergency situations that may arise int he [sic] future and no regular schedule is being

established" (PSF ¶ 134; DSF ¶¶ 68-69; Dkt. No. 63-21). On April 8, 2020, Plaintiff emailed Dr.

Kupferschmid and others expressing concern that her request had been deemed "low priority"

(PSF ¶¶ 135-39). That same day, Dr. Kupferschmid responded to Plaintiff's stated concern

about the treatment of her request as low priority, advising Plaintiff that her request was "low

priority" because her inpatient work did not translate easily to telework as compared to that of

primary care provider colleagues, and he electronically signed Plaintiff's Telework

Request/Agreement (PSF ¶ 140; DSF ¶ 69; Dkt. No. 63-21).

Plaintiff was paid under Administrative Weather & Safety Leave from March 16 through

April 6, 2020 (PSF ¶ 136; DSF ¶ 55). On April 21, 2020, Plaintiff requested ten additional

weeks of leave under the Expanded Family and Medical Leave Expansion Act ("EFMLEA") to care for her custodial grandchild, whose school was closed due to the pandemic (DSF ¶¶ 54-55). James Perrault, Senior Strategic Business Partner in the VA's VISN 1 Director's Office, Human Resources, explained to Plaintiff that she was not entitled to EFMLA because she was not on an intermittent or temporary appointment, which Plaintiff does not dispute, but that she was eligible for two weeks of paid sick leave under the Emergency Paid Sick Leave Act ("EPSLA") (DSF ¶¶ 56, 59).

On April 27, 2020, Plaintiff filed a second informal ORM complaint regarding alleged wage discrimination, as well as harassment and a hostile work environment based on her sex (PSF ¶ 142; DSF ¶ 11).  On May 8, 2020, the ORM notified Plaintiff that it was closing the informal counseling on her complaint and that she could either file a formal complaint within 15 days or take no further action (Dkt. No. 55-69).  On May 9, 2020, Plaintiff filed a formal ORM complaint alleging that her "employers subject [her] to compensation discrimination and pervasive hostile work environment because of [her] sex" (PSF ¶ 144; Dkt. No. 55-71; DSF ¶ 12).  On May 12, 2020, an HR specialist informed Plaintiff that, while she did not qualify for EFMLEA, her FMLA case remained open and she was eligible to be advanced 100 hours of annual leave if she chose to apply for it (DSF ¶ 62).  On May 13, 2020, Plaintiff accused VA leadership of withdrawing her approval for EPSLA.  Mr. Perrault indicated he was unaware of this having occurred and asked Plaintiff for documentation to support her claim (DSF ¶¶ 63-64). Plaintiff did not provide any documentation, and she used her paid EPSLA leave intermittently (DSF ¶¶ 65-66).

Plaintiff's family physician wrote another letter on Plaintiff's behalf on May 13, 2020, indicating that Plaintiff, as a 65 year-old woman with a history of high blood pressure, was at

high risk for developing complications from COVID, and recommending that Plaintiff be permitted to work from home during the pandemic until measures became available to mitigate her risk of infection, such as the availability of vaccination (PSF ¶ 146).  That same day, Plaintiff sent an email to VA leadership "request[ing] expediting reasonable telework accommodations pursuant to a consult with my physician," as well as emergency ORM alternative dispute resolution ("ADR") intervention regarding her recently filed complaint (PSF ¶ 148; DSF ¶ 71; Dkt. No. 63-23).  Mr. Perrault replied on the following day, indicating that he was "confused" because he understood her telework request to have been approved; he asked Plaintiff to advise him what was preventing her from teleworking and noted that, consistent with VACO guidance, in the event of insufficient work to be performed remotely, she would have to utilize leave if not able to work on site (DSF ¶ 72; Dkt. No. 63-18).  Mr. Perrault also advised Plaintiff that he would forward her email to the facility EEO officer to assist with her ORM request (DSF ¶ 73; Dkt. No. 63-18).

On May 15, 2020, a representative of Human Resources asked Plaintiff to complete reasonable accommodations request documents, which were attached, in order to begin the reasonable accommodation process (PSF ¶ 148; DSF ¶ 74).  The forms stated, "[a]n oral request from an employee is sufficient to begin the reasonable accommodation process.  Completion of this form is voluntary" (PSF ¶149; Dkt. No. 55-76; Dkt. No. 63-22).  Plaintiff replied to Mr. Perrault providing her doctor's letter and indicating her belief that categorizing her as a "low priority employee" and placing her on unpaid leave amounted to "discriminatory hostile action;" Plaintiff advised that she would be physically returning to work on Mondays and Wednesdays "against [her] doctor's advice," and teleworking Tuesdays and Thursdays, effective May 18, 2020 (PSF ¶¶ 151-54; Dkt. No. 55-77).

13

On September 27, 2020, Plaintiff was moved on to the locality pay system, resulting in an increase in salary as a Grade 13 Step 9 PA to $126,332 (DSF ¶ 45).  Plaintiff claims that between 2016 and 2021, she was paid less than several male VA employees on account of her sex. Plaintiff identifies three purported comparators, including NP William J. Sullivan, NP Miguel Olmedo, and PA Kevyn Miller.  Sullivan was appointed on January 1, 2012, Olmedo on August 25, 2014, and Miller on March 3, 2019; the Board set their initial grades and steps, with their corresponding annual compensation at $103,345, $125,825, and $119,588, respectively (DSF ¶¶ 28, 43).  Like Plaintiff, they received general adjustment and within-grade salary increases, as well as cash awards during the relevant time-period following their appointments (DSF ¶¶ 29, 44).  According to Plaintiff, she was paid $22,594 less than Olmedo and $54,005 less than Sullivan in 2016; $21,625 less than Olmedo and $56,833 less than Sullivan in 2017; $21,165 less than Olmedo and $41,151 less than Sullivan in 2018; $20,863 less than Olmedo, $41,151 less than Sullivan, and $8,584 less than Miller in 2019; $19,904 less than Olmedo, $36,646 less than Sullivan, and $8,584 less than Miller in 2020; and $20,091 less than Olmedo, $36,648 less than Sullivan, and $8,584 less than Miller in 2021 (PSF ¶¶ 71-72, 79, 81-83, 93).[10]

On October 2, 2020, Dr. Kupferschmid sent an email to Plaintiff and others advising, among other things, that Plaintiff would be responsible for primary care sick call coverage for certain hours on Wednesdays, Thursdays, and Fridays due to provider leave (PSF ¶ 156; Dkt.

---

[10] Plaintiff also complains about Sullivan's alleged yearly educational compensation, stating "[u]pon information and belief, Plaintiff alleges the agency continues to conceal the fact that it paid Mr. Sullivan approximately $30,000/year in educational wage benefits to allow him to attend UMass online as part of his employment package to become a Ph.D. nurse practitioner" (PSF ¶ 76).  Allegations made on information and belief are not properly part of the summary judgment record.  *Cadle Co. v. Hayes*, 116 F.3d 957, 961 (1st Cir. 1997) ("Statements made upon information and belief, as opposed to personal knowledge, are not entitled to weight in the summary judgment balance." (citing *Griggs-Ryan v. Smith*, 904 F.2d 112, 117-18 (1st Cir. 1990; Fed. R. Civ. P. 56(e))).

No. 55-79).  Plaintiff responded three days later by filing a complaint with Director Gill about

Dr. Kupferschmid's reassignment of her from an inpatient psychiatry unit to the sick call unit

where she asserted sick veterans would be walking in off the street without COVID-19 testing up

front, which she represented was a "threat to violently infect [her] and [her] loved ones with

COVID-19 should [she] refuse to submit to [Dr. Kupferschmid's] cruel, abusive and coercive

staffing incompetence" (PSF ¶¶ 158-160).  This reassignment was not implemented (PSF ¶ 170).

On November 11, 2020, Plaintiff filed a "Certification of Health Care Provider for

Family Member's Serious Health Condition Under the Family and Medical Leave Act" signed

by her physician in connection with her custodial grandparent relationship (PSF ¶ 163; Dkt. No.

55-82).  The form indicated that, over the next six months, Plaintiff would need between one and

five days of leave two to three times per month for medical care for episodic illnesses,

developmental exams, and COVID-19 caregiver needs (Dkt. No. 55-82).  According to Plaintiff,

during a virtual "quarterly provider support meeting" in June 2021, Dr. Kupferschmid

acknowledged the high quality of her clinical work but also criticized her work performance and

cut her off from speaking about her "point of view," saying he was "well aware of [her] doctor's

letter" (PSF ¶ 167).

On August 5, 2021, Plaintiff sent an email to Regional HR Director Pamela Draughn and

Mr. Perrault asking them to "update the delayed FMLA Renewal Approval," for which she had

filed on November 11, 2020, and indicating that she was "falling into another Title VII violation

by VACWM" due to the delay (PSF ¶¶ 163-64, 168; Dkt. No. 55-85).  Plaintiff received a

response from Chief, Labor Relations Rhonda Dechambeau, advising her that the processing of

her request had been delayed due to a "backlog" of special leave requests (PSF ¶ 169; Dkt. Nos.

55-85, 55-86).

A week later, on August 11, 2021, Dr. Kupferschmid emailed Plaintiff that "due to the ongoing low census and workload on the Inpatient Mental Health Wards," he would be "reassigning [her] to assist Primary Care with Sick Call and other functions within the [PA] Scope of Practice," effective September 26, 2021 (PSF ¶ 170; DSF ¶ 76; Dkt. No. 55-87; Dkt. No. 63-32). Plaintiff's usual assignment, the PTSD program, had been closed for a time during the pandemic and once reopened was operating at less than fifty percent pre-pandemic capacity, with Plaintiff seeing less than four patients per day (DSF ¶ 75).[11] Dr. Kupferschmid avers that, in making his decision to reassign Plaintiff, he considered the risk of infection, the clinical duties required, Plaintiff's medical conditions, Plaintiff's requested reasonable accommodation, the provision of virtual versus face-to-face medical care to patients, Plaintiff's tour of duty, and the physical demands of the reassignment (DSF ¶ 79).[12] At the time of the reassignment, the VA

---

[11] Plaintiff purports to dispute this fact "because it is untrue, cites Chief of Staff Kupferschmid's conclusory statements that are not supported by the referenced Exhibits and disputed by Dr. Shelly Berkowitz's eye-witness SMF testimony" (Dkt. No. 70 ¶ 75 response). A party cannot establish a dispute of material fact simply by claiming that an opponent's statement of fact is untrue without pointing to any countervailing potentially admissible evidence in the record. *See* Fed. R. Civ. P. 56(a) ("[a] party asserting that a fact … is genuinely disputed must support the assertion by … citing to particular parts or materials in the record"). Plaintiff has failed to do this. Moreover, while Plaintiff is correct that Exhibit 27 (Dkt. No. 63-27), cited by Defendant, does not appear to substantiate the reduced capacity claim standing alone (it appears to show the average number of patients by month from January 2021 through July 2021, with a low of 7.29 and high of 10.55, without providing any numbers from previous years for comparison), Dr. Kupferschmid's sworn statements in his affidavit are properly part of the record, indicative of admissible evidence, and support the asserted fact.

[12] Plaintiff purports to dispute Defendant's Fact ¶ 79, claiming that it is "conclusory, not supported and shown to be false as evidenced by Plaintiff's SMF 173-181…" (Dkt. No. 70 at ¶ 79 response). Defendant's fact is not "conclusory," and it is supported by Dr. Kupferschmid's sworn statement (Dkt. No. 63-15 at ¶ 27). Finally, Plaintiff's Facts ¶¶ 173-181, which she cites as creating a dispute as to Dr. Kupferschmid's statement, relate to email communications between Plaintiff and her union representatives and between Plaintiff's union representatives and HR regarding obtaining documentation substantiating the reduced census numbers. They do not create a dispute of fact about what factors Dr. Kupferschmid considered in reassigning Plaintiff. That said, the factors Dr. Kupferschmid did or did not consider in deciding to reassign Plaintiff to sick call are not material to this court's decision on the pending motions.

had a COVID screening process in place for all veterans presenting for care (DSF ¶¶ 80-81).[13]

In addition, with COVID vaccines being distributed starting in December 2020, followed by a

decrease in COVID cases, the VA CWMHS had returned to in-person care by June 2021, with a

95% vaccination rate among its staff (DSF ¶ 90).[14]

Plaintiff emailed her union representatives later that day on August 11, 2021, asking them

to intercede on her behalf regarding the intended reassignment and stating her view that it was in

retaliation for her August 5th inquiry about the status of her FMLA renewal (PSF ¶ 171).

Plaintiff's union representative requested the census numbers showing the change in workload

from HR and found the information provided inadequate to justify changing Plaintiff's working

conditions; she told HR that Plaintiff would remain "status quo" until the union was provided

information proving Plaintiff's diminished workload and the need for her labor elsewhere (PF ¶¶

173-179).

Dr. Kupferschmid's reassignment decision led Plaintiff to file her third informal ORM

complaint on September 7, 2021, alleging "reprisal (by disability, sex) under Title VII, Section

504 and EPA, to compel her to quit her job and deter her from engaging in protected … EEO

activities, most recently by the VA's attempt to reassign the custodial grandmother of a Covid-

---

[13] Plaintiff purports to dispute DSF ¶ 80 but none of the evidence she cites creates a material
dispute about Dr. Kupferschmid's averment that the VA had a screening process in place.  In
addition, Plaintiff cites an email she sent to Dr. Kupferschmid and others on September 13, 2021
in which she stated, "[t]here are recent Covid 19 positive patients on inpatient psychiatry …
There are also Covid Positive 4LDTOX admission candidates …" (Dkt. 55-99).  This statement
in Plaintiff's email, which she attaches to her affidavit, demonstrates that positive COVID cases
were not limited to the sick call clinic.  This supports Defendant's assertion in DSF ¶ 83, which
Plaintiff also purports to dispute, that all clinical staff were at risk of COVID infection.
[14] Plaintiff again purports to dispute DSF ¶ 90, calling it "a disputed, immaterial and unsupported
conclusory statement" (Dkt. No. 70 at ¶ 90 response).  This is insufficient to create a dispute
regarding Defendant's fact, which is supported by Dr. Kupferschmid's affidavit.  *See* Fed. R.
Civ. P. 56(a).

unvaccinated 3rd grader to a high Covid-exposure medical unit" (PSF ¶ 184; Dkt. No. 55-96; DSF ¶ 16).  On September 8, 2021, Plaintiff's physician wrote, "I have advised [Plaintiff] to remain out of work at this time [and] will reevaluate her ability to return to work in 90 days" (PSF ¶ 185).

In addition, on September 10, 2021, Plaintiff filed a "Certification of Health Care Provider for Employee's Serious Health Condition Under the Family and Medical Leave Act" signed by her physician, representing that Plaintiff was suffering from chronic "stress-related physical and emotional injury" with an onset date of September 8, 2021, and that it would be medically necessary for Plaintiff to be out of work due to an inability to provide medical care on an intermittent basis approximately 1-5 times per week, with each episode likely to last 1-5 days over the next six months (PSF ¶¶ 186-89).  Plaintiff notified Director Gill and Dr. Kupferschmid by email on September 13, 2021, that she was submitting for leave and would be out Monday through Wednesday for each of the next two weeks and was "taking each week as it comes" (PSF ¶ 190).  Plaintiff stated her belief that the proposed reassignment was retaliatory in response to protected activity and indicated that she hoped the leave was temporary because she was not ready to retire (PSF ¶¶ 191-94).[15]  Thereafter, on September 16, 2021, Plaintiff emailed

---

[15] Plaintiff filed a September 18, 2021, Summary Statement from an ORM complaint filed by Dr. Berkowitz, which she maintains "provides essential eyewitness testimony evidencing Dr. Kupferschmid's 'ongoing' discriminatory and retaliatory misconduct directed at [Plaintiff] …" (PSF ¶ 52; Dkt. No. 55-23).  In the document, Dr. Berkowitz states that Dr. Kupferschmid "continues to … subject me, and [Plaintiff] to ongoing harassment, intimidation as well as retaliation for our efforts to continue to champion the quality of patient care" (Dkt. 55-23 at 7).  The two examples Dr. Berkowitz provides regarding Plaintiff are: (1) a meeting in December 2019, attended by a representative of HR and the union, where she claims Dr. Kupferschmid "bullied" Dr. Berkowitz and Plaintiff into making it appear that their workload was less than it was to justify not replacing two vacant PA positions; and (2) the October 2, 2020, email about their reassignment to the sick call clinic (PSF ¶ 56).  Dr. Berkowitz's statement is not in the form of an affidavit, nor is there deposition testimony from Dr. Berkowitz in the record.  The Summary Statement is hearsay and not suitable for consideration on summary judgment.

HR attaching her doctor's September 10 letter advising her to remain out of work and asking that it be entered into the system (PSF ¶ 196). On September 23, 2021, Plaintiff filed a second formal ORM complaint making the same allegations as she had in her September 7, 2021, informal complaint (PSF ¶ 201; Dkt. No. 55-101; DSF ¶ 17).

Ms. Stein was notified on October 7, 2021, by HR, "your medical indicates you will be out of work for 90 days. FMLA is approvable up to 60 days. You will need to request additional leave beyond the date on the memo should you require leave beyond this date" (PSF ¶ 202; Dkt. No. 55-102). In addition, Plaintiff was provided instructions to request all special leave programs, forms, and a brief description of the programs (Dkt. No. 55-102). On October 27, 2021, Plaintiff emailed Dr. Kupferschmid and Director Gill stating that, "after much consideration, I am compelled to give my notice of retirement … effective October 31, 2021 (PSF ¶ 203; Dkt. No. 55-103; DSF ¶ 5, 18). According to Plaintiff, the proposed reassignment was retaliatory and forced her resignation because it "threaten[ed] to increase her work-related stress conditions and subject her to a higher risk of contracting the Covid-19 virus;" "nullif[ied] her … agency-approved reasonable FMLA and other accommodations," and "ma[d]e [Plaintiff] fearful to come into work" (PSF ¶¶ 195, 204). After Plaintiff's resignation, Dr. Kupferschmid replaced her with PA Miller, who had previously been working on the Sick Call Unit (PSF ¶ 205).

### III.    LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' when a rational factfinder could resolve it either direction." *Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 5 (1st Cir.), *rev. denied*, 885 F.3d 52 (1st Cir. 2018)

(citing *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 4 (1st Cir. 2010)). "A fact is 'material' when its (non)existence could change a case's outcome. *Id*. (citing *Borges*, 605 F.3d at 5).

A party seeking summary judgment is responsible for identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325). If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute." *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The record is viewed in favor of the nonmoving party, and reasonable inferences are drawn in the nonmoving party's favor. *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (citing *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)). The summary judgment "framework is not altered by the presence of cross-motions for summary judgment." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003) (citing *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir. 1996)).

### IV.    DISCUSSION

### A.    Title VII Claims

"Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex.'" *O'Horo v. Bos. Med. Ctr. Corp.*, 131 F.4th 1, 12 (1st Cir. 2025) (quoting 42 U.S.C. §

2000e-2(a)(1)).  Title VII liability can be based on disparate treatment or the creation of a hostile

work environment.  *Id.*  Plaintiff brings claims under both theories, as well as for retaliation,

which the court addresses seriatim.

### 1.  *Count I: Disparate Compensation*

Plaintiff claims that she was treated differently with respect to her compensation based on

her sex.  In a disparate treatment case brought under Title VII, the plaintiff bears the ultimate

burden of proving that she was the victim of intentional discrimination motivated by her

membership in a protected class.  *Id*. at 13 (quoting *Espinal v. Nat'l Grid NE Holdings 2, LLC*,

693 F.3d 31, 34 (1st Cit. 2012); citing 42 U.S.C. § 2000e-2(a))).  Where, as here, there is no

direct evidence of discriminatory intent, a court applies the familiar burden-shifting framework

set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973), to determine if the

undisputed material facts support an inference of discrimination.  *O'Horo*, 131 F.4th at 13

(quoting *Ing v. Tufts Univ.*, 81 F.4th 77, 82 (1st Cit. 2023)).  The burden rests first on the

plaintiff, who must establish a prima facie case.  *Id*. (quoting *Cherkaoui v. City of Quincy*, 877

F.3d 14, 24 (1st Cir. 2017)).  "Under Title VII a prima facie case of discrimination in

compensation can be demonstrated where a plaintiff shows '(1) [s]he is a member of a protected

class; (2) [s]he met [her] employer's expectations; (3) [s]he suffered adverse employment action

with respect to compensation; and (4) similarly-situated employees outside the protected class

received more favorable treatment.'"  *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 88

(1st Cir. 2018) (alterations in original) (quoting *Prescott v. Higgins*, 538 F.3d 32, 40 (1st Cir.

2008)).  "Making this modest showing raises an inference of intentional discrimination," and

shifts to the employer a burden of production "to articulate a legitimate, nondiscriminatory

reason for the challenged employment decision."  *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir.

2010) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981)). "That is not an onerous task: The employer need only articulate a reason 'which, on its face, would justify a conclusion that' the adverse employment action was taken for a nondiscriminatory motive." *O'Horo*, 131 F.4th at 14 (quoting *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021). This shifts the burden back to the plaintiff, who is required at step three of the *McDonnell Douglas* framework "to make two showings by a preponderance of the evidence: first, that the reasons given by the defendant-employer 'w[ere] mere pretext and[, second,] that their true motive [behind the adverse employment action] was discriminatory.'" *Id*. at 15 (alterations in original) (quoting *Cherkaoui*, 877 F.3d at 27). "The *McDonnell–Burdine* framework addresses only the formal allocation of the burdens of production; the 'ultimate burden of persuasion' remains at all times with the plaintiff." *McMillan v. Mass. Soc. for Prevention of Cruelty to Animals*, 880 F. Supp. 900, 905 (D. Mass.), *on reconsideration in part*, 168 F.R.D. 94 (D. Mass. 1995) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

Plaintiff rests her disparate compensation claim on her contention that the VA paid male NPs Olmedo and Sullivan greater annual compensation than her for the years 2016-2021 and male PA Miller greater annual compensation than her for the years 2018-2021.[16] Regarding Plaintiff's prima facie case, she is a woman and thus a member of a protected class, and there

---

[16] Plaintiff also submits a chart (Dkt. No. 55-38) "comparing the yearly wages of the 50 highest paid VACWM employees by gender (28 men and 22 women) from 2011-2017," which she argues "evidences the existence of a long-time government custom, practice, or policy of wage discrimination against female employees that is knowing, pervasive and willful" (PSF ¶ 86). Plaintiff's chart, which fails to identify the positions held by any of the identified individuals or any other pertinent information aside from the individual names and pay, cannot and does not prove the existence of such a custom or practice and is irrelevant to Plaintiff's Title VII disparate pay claim.

appears to be no dispute about Plaintiff's qualifications or the fact that Olmedo, Sullivan, and Miller, all men, received greater annual compensation than Plaintiff. Defendant disputes that Olmedo and Sullivan are suitable comparators where both are NPs while Plaintiff was a PA, and, according to Defendant, the physical and mental efforts required to perform the duties of an NP and PA differed in many respects, a representation that Plaintiff hotly contests. In addition, Olmedo worked at a VA facility in Worcester, MA, which follows a higher salary scale due to locality pay, where he received the same salary as female NPs with the same grade, step, and locality (DSF ¶ 40). For purposes of summary judgment, Defendant does not appear to dispute that Sullivan, also a PA, is a suitable comparator.

The court may "'bypass the prima facie case issue [where] it is clear that [P]laintiff has not mustered enough evidence for a reasonable jury to conclude that [the defendant's] stated reason' for the employment action was pretextual." *Cham v. Station Operators, Inc.*, 685 F.3d 87, 95-96 (1st Cir. 2012) (second alteration in original) (quoting *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 100 (1st Cir. 2007)). Defendant's stated justification for the pay differential here is that Plaintiff and the three male employees she identifies as comparators were paid by statute and according to gender neutral pay scales. Plaintiff has not submitted competent evidence to show that this reason is a pretext.

Plaintiff, Olmedo, Sullivan, and Miller were all appointed under 38 U.S.C. § 7401(1) at grades and pay determined by a panel of peers utilized by the VA for such purposes based on their current experience, education and training, current licensure, and any other certifications held. Plaintiff has not claimed or submitted evidence showing that the panel acted in a discriminatory fashion based on her sex or that there was anything improper about the initial grades and pay determined by the panel for herself, Olmedo, Sullivan, or Miller. Regarding

Olmedo and Sullivan, their pay was higher not because of their sex, but because they were NPs and were paid using the higher NP pay schedule. In addition, Olmedo worked in Worcester, which has a higher salary scale due to locality pay not sex, as evidenced by the fact that he received a salary identical to the salaries paid to female NPs assigned the same grade, step and locality. Miller, like Plaintiff, was a PA, but Plaintiff has not pointed to any evidence that would allow a reasonable jury to conclude that he was not paid according to gender neutral pay scales based on the grade and pay determinations of the panel utilized by the VA, just as Plaintiff was.

Plaintiff asserts that she is entitled to summary judgment on her Title VII claim because she was paid less than her male comparators for performing a job of equal skill, effort, and responsibility under similar working conditions. This is the standard for establishing a prima facie case of wage discrimination under the EPA, not under Title VII. *See Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). While "proof of discriminatory intent is not required to establish a prima facie case under the [EPA]," proof of discriminatory intent is required under a Title VII disparate treatment theory such as Plaintiff's. *Id*. at 360 (citing *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5th Cir.), *cert. denied,* 485 U.S. 930 (1988), *abrogated on other grounds*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). Moreover, under the EPA, "'[o]nce the plaintiff establishes a prima facie case, the defendant must "prove" that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex.'" *Id*. (quoting *Buntin v. Breathitt Cty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir.1998)). Conversely, under Title VII, "a 'defendant need only assert a legitimate, non-discriminatory reason for the different treatment afforded the

plaintiff as compared to her similarly situated male co-workers,' *Buntin*, 134 F.3d at 799 n. 6, at which point the burden shifts back to the plaintiff to show pretext." *Beck-Wilson*, 441 F.3d at 360. Defendant did so here, shifting the burden back to Plaintiff, who has failed to muster enough evidence to justify a reasonable jury in concluding that Defendant's stated reason was pretextual.[17] *Cham*, 685 F.3d at 87.

The cases cited by Plaintiff in support of her motion for summary judgment are distinguishable. In *Beck-Wilson*, seventeen former and current NPs brought suit alleging that the VA was violating the EPA by paying predominantly female NPs at a lower rate than predominantly male PAs. *Id*., 441 F.3d at 356. The primary named plaintiff also brought a wage discrimination claim under Title VII. *Id*. The Sixth Circuit reversed the district court's grant of summary judgment to the VA based on its finding that the plaintiffs had established a prima facie EPA violation while the VA had not established its affirmative defense – that the difference in pay was due to a factor other than sex – so clearly that no rational jury could have found otherwise. *Id*. at 365. Specifically, the court found that the VA's defense that the two Congressionally-mandated pay scales for NPs and PAs amounted to a "factor other than sex" was not dispositive where a reasonable jury could conclude that the VA's claim that (1) it had to continue to pay the predominantly male PAs on a special higher pay scale to ensure competitive

---

[17] Plaintiff seems to suggest that Defendant admitted the pay scales were discriminatory, claiming that, "[o]n or about October 8, 2019, [Plaintiff] had a conversation with Director Collins' replacement, Acting VACWM Director Andrew McMahon … [about Plaintiff's] allegations of wage discrimination against female employees [in which] Director McMahon agreed … that, 'they [male and female mid-level pay scales] should be made equal" (PSF ¶ 95). While the court accepts as true for purposes of summary judgment statements in Plaintiff's affidavit based on her personal knowledge, the court does not accept as true her insertion of the words "male and female mid-level pay scales" into McMahon's statement that "they should be made equal," particularly in light of the record establishing that the pay scales for NPs and PAs were gender neutral and in the absence of any evidence of a gender disparity between the employees filling the two roles.

pay and adequate staffing; and (2) that it had no NP recruitment problem authorizing it to create a special pay scale for NPs was pretextual. *Id*. at 367-69. This was true because there was evidence in the summary judgment record raising a genuine issue as to the VA's claims that it had to maintain the special pay rate for PAs to ensure competitive pay and adequate staffing despite no longer having a recruitment or retention problem for PAs and that it did not have a recruitment and retention problem for NPs. *Id*. On this basis the court concluded, "given that the VA has refused to issue a special salary pay scale for the NPs at the VAMC at the same time that it has insisted upon extending the special salary pay scale for the PAs, a reasonable jury could conclude that the VA's contention that the pay scales are responsible for the existing pay differential between NPs and PAs … is a pretext for sex discrimination." *Id*. at 369.

Two critical differences distinguish *Beck-Wilson* from the present case. First, Plaintiff does not claim, nor is there evidence in the record supporting such a claim, that PAs at the VA CWMHS were predominantly female or that NPs were predominantly male. Without such evidence of a gender divide, a reasonable jury would not be justified in finding that Defendant's contention that the pay scales are responsible for any pay differential between PAs and NPs is a pretext for sex discrimination against PAs. Second, Plaintiff does not dispute, nor present any evidence to dispute, VA CWMHS's representation that it determined in 2017 that an approximate 5% increase over the previous pay schedule was necessary to ensure retention and recruitment needs for NPs in western Massachusetts. While Plaintiff purports to dispute that the VA conducted a PA salary range review and determined it did not have a recruitment and retention issue for PAs, she does not present any evidence that would make this a triable issue. Plaintiff's claim is for a violation of Title VII, not the EPA. Where in an EPA case, the defendant bears the burden of proving the affirmative defense, under Title VII, once the

defendant has articulated a legitimate, non-discriminatory reason for the challenged conduct, the plaintiff is required to present evidence "tending 'to show that the defendant's stated reason for [the adverse employment action] was a pretext for discrimination.'" *O'Horo*, 131 F.4th at 13 (quoting *Boykin v. Genzyme Therapeutic Prods., LP*, 93 F.4th 56, 60 (1st Cir. 2024)). Plaintiff has failed to do so.

Plaintiff also cites *Allison v. United States*, 39 Fed. Cl. 471 (Fed. Cl. 1997), a case strikingly similar to *Beck-Wilson*. In *Allison*, the plaintiffs – nine female NPs – presented evidence in support of their EPA claim that NPs were predominantly female, that PAs were predominantly male, and that the relevant VAMC was suffering problems recruiting and retaining qualified NPs, thereby creating a genuine issue of disputed material fact as to whether the VAMC had the authority to create special pay schedules for NPs. *Id.* at 473, 476-77. Thus, *Allison* is distinguishable on the same bases as *Beck-Wilson*. Because Plaintiff has not proffered evidence tending to show that Defendant's stated reason for the lower pay Plaintiff received as compared to her identified comparators, that being that Plaintiff and the three comparators were paid by statute and according to gender neutral pay scales, was a pretext for discrimination, her Title VII claim is insufficient to survive Defendant's motion for summary judgment.

### 2. Count III: Hostile Work Environment

"'Title VII ... allows a plaintiff to prove unlawful discrimination by showing that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'" *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006) (quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001)). There are six elements a plaintiff must establish to succeed on a hostile work environment claim:

> (1) that she … is a member of a protected class; (2) that she was
> subjected to unwelcome sexual harassment; (3) that the harassment
> was based upon sex; (4) that the harassment was sufficiently severe
> or pervasive so as to alter the conditions of plaintiff's employment
> and create an abusive work environment; (5) that sexually
> objectionable conduct was both objectively and subjectively
> offensive, such that a reasonable person would find it hostile or
> abusive and the victim in fact did perceive it to be so; and (6) that
> some basis for employer liability has been established.

*Id.* (quoting *O'Rourke*, 235 F.3d at 728).  In assessing whether a plaintiff has shown that her

work environment was hostile, the court considers the "totality of the circumstances," including

"'the frequency of the discriminatory conduct, its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance."  *Id.* (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)).

Plaintiff contends that she experienced harassment that was "sufficiently severe or

pervasive, permeated with so much discriminatory intimidation, threats and insult, that it made

[Plaintiff's] work environment unbearable and caused her so much emotional and physical (high

blood pressure) distress, insomnia, anxiety and fear, that it made [Plaintiff] afraid to be at work"

(Dkt. No. 54 at 24).  Plaintiff makes repeated, conclusory statements that she was subjected to a

hostile work environment because of her sex in her statement of facts, but she offers few

instances to support her claim.  Careful review of Plaintiff's lengthy statement of facts reveals

the following discrete occurrences.  In December 2016 or January 2017, shortly after Dr.

Kupferschmid's promotion to Chief of Staff, Plaintiff attended her first inpatient medical

provider team meeting with him.  During the meeting, Dr. Kupferschmid stated that he "hate[d]

dealing with those FMLA people," which Plaintiff interpreted to mean her as a custodial

grandmother with childcare duties, as well as two of her women colleagues who had health

issues.  In April 2017, Dr. Kupferschmid remarked to Plaintiff, "[i]t must be so difficult to be a

grandmother parenting young children." In late November or early December 2018, following a complaint by Plaintiff about inequitable pay, Dr. Kupferschmid suggested she might look for employment outside the VA. Finally, in April 2020, Dr. Kupferschmid characterized her request for telework as "low priority." As background for these instances, Plaintiff argues that she was aware Dr. Kupferschmid also harassed Drs. Berkowitz and Kemble, PA Lapour, and "many younger female nurses and social workers" (Dkt. No. 54 at 35). In addition, when Plaintiff complained about Dr. Kupferschmid to Directors Collins and Gill, they refused to investigate or take any action.

These allegations, viewed individually and collectively, "do not amount to the sort of severe and pervasive harassment based on gender necessary to establish a hostile work environment claim." *O'Horo*, 131 F.4th at 19-20. Most of the incidents lack an obvious relationship to gender, notwithstanding Plaintiff's stated subjective belief. That Dr. Kupferschmid's comment that he "hate[d] dealing with those FMLA people" is sexist is not a reasonable inference to be drawn from the record, entirely devoid as it is of any context. Plaintiff states her belief that Dr. Kupferschmid was referring specifically to her and two of her women colleagues who had health issues, but the record does not contain evidence to support that inference, such as evidence that Plaintiff and her two female colleagues were the only female employees on FMLA or that only, or predominantly, female employees at the VA CWMHS were taking advantage of FMLA protections. Plaintiff's subjective beliefs are insufficient at the summary judgment stage. *See O'Horo*, 131 F.4th at 20 (citing *Henderson v. Mass. Bay Transp. Auth.*, 977 F.3d 20, 29 (1st Cir. 2020)). Nor is there anything obviously sex-based about Dr. Kupferschmid's classifying Plaintiff's request for telework at the beginning of the global pandemic as low-priority, and there is no evidence in the record supporting such an

inference, such as the VA CWMHS classifying other female employees' requests for telework as lower priority than requests by comparable male employees.

The remaining evidence – Dr. Kupferschmid's comment about Plaintiff's being a custodial grandmother and his statement that she might want to look for work elsewhere following her complaint of a sex-based pay discrepancy – does not amount to a "workplace situation so severe or so pervasive with discriminatory animus that it amounts to a hostile work environment."[18]  *See O'Horo*, 131 F.4th at 21.  These facts are considerably less severe than others that have been held to be insufficient to meet this standard.  *See Colón-Fontánez v. Mun. of San Juan*, 660 F.3d 17, 44 (1st Cir. 2011) (holding that facts indicating an "uncomfortable and tense working" environment – including the supervisor refusing to meet with the plaintiff while permitting other employees to come and go from her office, avoiding the plaintiff, making the plaintiff wait for her, restricting the plaintiff's access with her, refusing to amicably greet the plaintiff, throwing the plaintiff out of her office, yelling at the plaintiff in front of other employees, failing to take action against other employees who made comments against the plaintiff, designating co-workers to monitor the plaintiff, excluding the plaintiff from a workshop, and making insensitive comments about the plaintiff's protected status – were insufficient to constitute a hostile work environment).  Nor were the instances Plaintiff identifies pervasive, taking place as they did over a year apart.  *See Alvarado v. Donahue*, 687 F.3d 453, 462 (1st Cir. 2012) (""[T]hree discrete verbal exchanges taking place over the course of a period spanning more than eight months …. simply does not rise to the level of pervasiveness or gravity … indicative of a hostile or abusive work environment.").  Plaintiff's facts simply do not come

---

[18] This conclusion would be equally true even if the record supported the inference that the FMLA people comment and the low priority assignment could be considered sex-based.

close to meeting the standard for establishing a hostile work environment.  *See Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000) ("The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins … to survive the slings and arrows that workers routinely encounter in a hard, cold world.").

Although Plaintiff claims that Drs. Berkowitz and Kemble, PA Lapour, and younger female VA employees were harassed by Dr. Kupferschmid, the record does not support such a finding.  That Plaintiff believes these women were harassed does not establish that they were harassed.  The unsworn statements in emails and otherwise by Dr. Berkowitz claiming that she and Plaintiff were discriminated against and subjected to a hostile work environment by Dr. Kupferschmid are not properly part of the summary judgment record.  The same applies to the hearsay statements made to Plaintiff by other female employees complaining about Dr. Kupferschmid's treatment of them.  Plaintiff's failure to provide evidence – either affidavits based on personal knowledge or deposition testimony – prevents her from being able to rely on the alleged treatment of other female employees to support her claim.

In this regard, Plaintiff's case is readily distinguishable from *Acevedo-Torres v. Municipality of Arecibo*, 857 F. Supp. 2d 231, 235 (D.P.R. 2013), on which she relies.  In *Acevedo-Torres*, the plaintiff alleged that a fellow police officer told her he was horny, showed her his penis, and asked if he could masturbate in front of her.  *Id*. at 233.  The plaintiff also alleged that four other female officers had been subjected to that same officer's lewd behavior, which the court found "relevant to the Plaintiff's reasonable perception of a hostile work environment," in the context of denying a motion to dismiss by the defendant-employer.  *Id*. at 235.  This is not a motion to dismiss where the plaintiff's allegations are entitled to a presumption of truth.  Plaintiff's unsubstantiated allegations that Dr. Kupferschmid harassed

other female employees cannot be relied upon to help establish a triable issue as to a hostile work environment at this procedural juncture.  Nor does Plaintiff's averment that Directors Collins and Gill did nothing to investigate her claims fortify the claim of a hostile work environment in the absence of evidence establishing one.  Thus, Defendant is entitled to summary judgment on Plaintiff's Title VII claim based on an allegedly hostile environment.

*3.  Count V:  Retaliatory Constructive Discharge*

Plaintiff also claims that Dr. Kupferschmid's threat to transfer her to sick call amounted to a retaliatory constructive discharge in violation of Title VII.  Liability may arise under Title VII where an employee suffers discrimination because she has "opposed" an unlawful employment practice under Title VII or "made a charge  … or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  *Valentin-Almeyda*, 447 F.3d at 94 (quoting 42 U.S.C. § 2000e-3(a)).  "To succeed on her retaliation claim, [Plaintiff] must show that "(1) she engaged in protected activity; (2) she suffered some materially adverse action; and (3) the adverse action was causally linked to her protected activity."  *Stratton v. Bentley Univ.*, 113 F.4th 25, 41–42 (1st Cir. 2024) (quoting *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 81 (1st Cir. 2007)).  The *McDonnell Douglas* burden shifting framework applies equally to retaliation claims.  *Id*.  However, in the context of a retaliation claim as opposed to a discrimination claim, the standard for an adverse action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  Thus, the appropriate question with respect to whether Plaintiff has shown an adverse action is whether Dr. Kupferschmid's contemplated reassignment would have dissuaded a reasonable employee in Plaintiff's position from making a complaint of discrimination.  *Stratton*, 113 F.4th at 41-42.  With respect to the causation factor, a

plaintiff must prove "that the 'protected activity was a but-for cause of the alleged adverse action by the employer.'"  *Id*. at 44 (quoting *Ing*, 81 F.4th at 79).  "Put simply, a plaintiff must show that their employer would not have taken the adverse action but for a desire to retaliate."  *Id*. (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).

Here, the court need not "opine on whether [Plaintiff] furnished enough evidence to establish the materially adverse action prong because her retaliation claim ultimately fails for lack of causation."  *Id*.  Plaintiff relies on temporal proximity to raise on inference of causation. *See Rivera-Velázquez v. Regan*, 102 F.4th 1, 13-14 (1st Cir. 2024) ("One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action." (quoting *Wyatt v. City of Boston*, 35 F.3d 13, 16 (1st Cir. 1994))).  However, the alleged protected activity that was close in time to the asserted retaliatory act, i.e., Dr. Kupferschmid's August 11, 2021, email threatening Plaintiff with reassignment to sick call, is Plaintiff's August 5, 2021, email to HR asking for her FMLA approval to be updated and characterizing the delay as "another Title VII violation."  There is no evidence in the record that Dr. Kupferschmid knew of Plaintiff's August 5, 2021, email when he decided to reassign her.  His name does not appear on the email chain, and no other evidence in the record has been identified as substantiating his knowledge.  "Without evidence of a decisionmaker's knowledge of the protected conduct, the adverse action 'could not have been caused by a desire to retaliate against' the plaintiff."  *Stratton*, 113 F.4th at 45 (quoting *Velazquez-Ortiz v. Vilsack*, 657 F.3d 64, 73 (1st Cir. 2011)).  Nor could Plaintiff temporally tie the alleged retaliation to her most recent formal ORM complaint of which Dr. Kupferschmid was aware, as she filed it over a year earlier, on May 9, 2020.  *See Quintana-Dieppa v. Dep't of Army*, 130 F.4th 1, 17 (1st Cir. 2025) ("[W]e doubt that the three- or four-month period between the two events would suffice to

establish the causal link required for even a prima facie showing of retaliation.").  Thus, Defendant is entitled to summary judgment on Plaintiff's claim of retaliatory constructive discharge under Title VII.

    B. <u>Rehabilitation Act Claims</u>

       *1. Count IV:  Denial of Reasonable Accommodation*

Plaintiff claims that Defendant discriminated against her on the basis of her disability, namely high blood pressure and risk factors for developing complications from COVID, by "ma[king] it impossible for her to see patients from home with a VA-issue laptop, thus denying Ms. Stein reasonable accommodations … pursuant to her physician's orders" (Dkt. No. 54 at 43).[19]  "The Rehabilitation Act aims to 'prohibit discrimination against an otherwise qualified individual based on his or her disability.'"  *Serrano-Colon*, 121 F.4th at 274 (quoting *Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 19 (1st Cir. 2004)).  The *McDonnell Douglas* burden-shifting framework applies to Plaintiff's Rehabilitation Act claim.  *Id.* at 277 (citing *Ríos-Jiménez*, 520 F.3d at 40).  To put forth a prima facie failure to accommodate claim, a plaintiff must show that "(1) 'she was disabled within the meaning of the statute;' (2) 'she was qualified to perform the essential functions of the job, either with or without a reasonable accommodation;'" and (3) the defendant "'despite knowing about [her] disability, did not acquiesce to [her] request for a reasonable accommodation.'"  *Id*. (quoting *Ríos-Jiménez*, 520 F.3d at 41).

---

[19] Plaintiff also argues that Defendant violated the Rehabilitation Act by "tak[ing] adverse actions against her" (Dkt. No. 54 at 43), but she fails to identify the allegedly adverse actions taken based on discriminatory animus because of disability.  *See Serrano-Colon v. United States Dep't of Homeland Sec.*, 121 F.4th 259, 274 (1st Cir. 2024) (outlining the elements of a prima facie case of disability discrimination, which includes a showing that "'the employer took adverse action against [the plaintiff] because of the disability.'") (quoting *Ríos-Jiménez v. Principi*, 520 F.3d 31, 41 (1st Cir. 2008))).

At the summary judgment stage, Defendant does not dispute that Plaintiff can show the first two elements.  The live dispute relates to the third element.  The record establishes that Plaintiff made four requests for reasonable accommodation.  Plaintiff's first two requests were submitted during the early days of the COVID-19 pandemic.  First, Plaintiff submitted a March 18, 2020, letter from her physician excusing her from work responsibilities from March 16 to April 6, 2020, to care for her grandson (Dkt. No. 55-64).  Second, Plaintiff submitted a letter from her physician dated two days later, stating that she had advised Plaintiff to "self-quarantine due to concerns related to Covid-19," and that she would need to remain out of work from March 16 to April 6, 2020, due to a government mandated school closure (Dkt. No. 55-65).  Setting aside the questionable proposition that either of these letters amounts to a request for a reasonable accommodation of Plaintiff's disabilities, there is no evidence in the record that Plaintiff was denied the ability to be out of work from March 16 to April 6, 2020.  To the contrary, the record establishes that Plaintiff took paid leave during this time.  Third, Plaintiff provided a May 13, 2020, letter from her doctor indicating that she has high blood pressure and high risk factors for developing complications from COVID and recommending that Plaintiff "request a reasonable accommodation that would permit her to perform telework from home during the pandemic [which] should remain in place until there are measures that can reduce her risk of acquiring infection such as vaccination, is available" (Dkt. No. 55-73).  The record establishes that Plaintiff requested an ad hoc telework agreement for non-medical reasons on April 3, 2020, and that Dr. Kupferschmid approved it on April 8, 2020, even before Plaintiff submitted her doctor's letter.  When Plaintiff submitted her physician's letter and stated her displeasure about her request being characterized as low-priority, Mr. Perrault responded the following day noting that Dr. Kupferschmid had approved her request and asking Plaintiff to tell

him what was preventing her from teleworking. There is no record of Plaintiff having responded with the requested information, and no other basis in the record for finding that Plaintiff was denied this reasonable accommodation. To the extent that Plaintiff asserts the accommodation was denied when Dr. Kupferschmid told her he was going to transfer her to sick call in October 2020, that reassignment did not take place. And, by the time Dr. Kupferschmid indicated in August 2021 that he was again planning to transfer Plaintiff to sick call, vaccines were widely available. This was the precise condition identified in Plaintiff's physician's letter that would allow Plaintiff to return to in-person work. Finally, when Plaintiff submitted her physician's final September 10, 2021, letter indicating that she had advised Plaintiff to remain out of work and would reevaluate her ability to return to work in 90 days, Defendant approved Plaintiff for 60 days of leave with instructions to request additional leave as needed. Again, Plaintiff has not shown a denial of a reasonable accommodation. Thus, Plaintiff's claim of discrimination by failure to accommodate under the Rehabilitation Act fails.

### 2. *Retaliation in Violation of the Rehabilitation Act*

Plaintiff's final claim is for retaliation in violation of the Rehabilitation Act. For her claim of retaliation to survive summary judgment, Plaintiff must point to evidence in the record to support that: (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) the protected activity was the but-for cause of the adverse employment action. *Calero-Cerezo*, 355 F.3d at 25; *Palmquist v. Shinseki*, 689 F.3d 66, 77 (1st Cir. 2012). Once again, the court applies the *McDonnell Douglas* framework.

Here too the court bypasses the first two prongs because Plaintiff's claim fails on the causation element. Plaintiff argues that the retaliatory adverse actions consisted of Dr. Kupferschmid's attempts to reassign her to cover the sick call unit. However, the record is

devoid of "evidence that would allow a reasonable jury to find 'that [Defendant's] …actual reason for the adverse employment action is discriminatory.'" *Rios v. Centerra Grp. LLC*, 106 F.4th 101, 112 (1st Cir. 2024) (quoting *Johnson v. Univ. of P.R.*, 714 F.3d 48, 54 (1st Cir. 2013)).  There is no temporal proximity to protected activity or other evidence on which to base such a finding as to either proposed reassignment.  Plaintiff's requests for accommodations were made in March 2020, May 2020, and September 8, 2021.  Dr. Kupferschmid raised the sick call reassignments in emails to Plaintiff dated October 2, 2020, and August 11, 2021, which are insufficiently close in time to the protected activity to raise an inference of retaliatory intent.[20] *See Quintana-Dieppa*, 130 F.4th at 17.  Moreover, neither reassignment was implemented. Plaintiff claims that her resignation was the result of retaliatory constructive discharge because she would not have resigned had it not been for the contemplated reassignment.  The court need not determine whether Plaintiff would meet the standard for constructive discharge, however, because she has not introduced evidence on which to base a finding that the but-for cause of the reassignment was retaliatory.  As such, Defendant is entitled to summary judgment on Plaintiff's Rehabilitation Act retaliation claim as well.

## V.    CONCLUSION

For the foregoing reasons, the court GRANTS IN PART Plaintiff's motion (Dkt. No. 64) insofar as she seeks leave to exceed the page limit considering her *pro se* status; DENIES IN PART Plaintiff's motion (Dkt. No. 64) insofar as she seeks to have her statement of facts deemed

---

[20] To the extent Plaintiff would rely on her August 5, 2021, email to Ms. Draughn and Mr. Perrault about her FMLA approval as protected activity, her claim would still fail.  As discussed above, the record does not establish that Dr. Kupferschmid had knowledge of the request.  In addition, while Plaintiff claimed the delay was "falling into another Title VII violation by VACWM," she did not invoke the Rehabilitation Act, which protects against disability discrimination, at the time.

admitted; DENIES Defendant's request to have Plaintiff's statement of facts stricken, which is not in the form of a motion (Dkt. No. 63); DENIES Plaintiff's motion for summary judgment (Dkt. No. 53); and GRANTS Defendant's cross-motion for summary judgment (Dkt. No. 62). Judgment shall enter in favor of Defendant on all counts of Plaintiff's complaint, and the case should be closed on the court's docket.

It is so ordered.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED: September 23, 2025